**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re, | Case No. 13-00665-dd |
| William Maxwell Gregg, II, | Chapter 11 |
| | **ORDER CONDITIONING THE STAY** |
| Debtor. | |

This matter is before the Court on a motion, pursuant to 11 U.S.C. § 362(d), for relief from stay filed by Russell Brands, LLC, formerly Russell Corporation ("Russell Brands") on November 18, 2013. The debtor, William Maxwell Gregg, II ("Debtor"), filed an objection. The Court held a preliminary hearing on the motion on December 10, 2013, and a final hearing on January 7, 2014. After careful consideration of the applicable law, evidence submitted, and arguments of counsel, there is cause for conditioning the continued application of the stay to the property to which the motion relates as set forth below.[1]

**FINDINGS OF FACT**

1.      Debtor filed a petition under chapter 11 of the Bankruptcy Code on February 1, 2013.

2.      In 2002, Russell Brands sued Debtor in state court in South Carolina on a personal guarantee of accounts for merchandise it supplied. The parties reached a settlement wherein Russell Brands and Debtor agreed to a compromise of $1,000,000 as the amount due. The settlement was secured by three parcels of real property: two parcels in Richland County,

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

South Carolina and a historic home at 486 Rutledge Drive in Flat Rock, North Carolina (the

"North Carolina property"). Debtor executed a deed of trust for the North Carolina property,

which was recorded in Henderson County, North Carolina.

3.     Russell Brands seeks relief from stay with respect to the North Carolina property

only.

4.     Debtor purchased the North Carolina property in 1995 for a $1,050,000. The

property consists of 23 acres with a large historic home on it and a smaller house. The historic

home was built in 1827 and is one of the oldest homes in the Flat Rock area.

5.     The North Carolina property is in a state of disrepair, and Debtor's counsel agrees

the historic home is a "wreck." Debtor does not live on the property but has camped there a few

times and had a party for the local historic society shortly after he purchased it. Debtor last

visited the property in September or October of 2013. The house suffered serious freeze damage

in January of 1996 when the radiators cracked. Debtor made an insurance claim for the damage,

and the insurance company offered $43,000, which Debtor rejected. The insurance company

paid $600,000 in settlement in 2009. Most of the $600,000 went to the bank that held a lien on

the property. There has been no power to the historic home since 2010. Debtor thinks there is

water service. The historic home incurred significant damage from vandalism, which resulted in

all of the windows being replaced and the sinks and toilets being removed. The historic home's

roof is damaged, and there is significant water damage. Debtor testified he thought the roof had

been repaired in October 2013. However, it turns out the work was not completed, and Debtor

testified he "just forgot about it."

6.     Photographs were introduced into evidence showing water damage in the

sunroom area, deterioration to support beams, white mold growing on support beams under the

kitchen, deterioration to the front porch ceiling, deterioration of the portico, paint peeling off the walls in the interior, and a tarp over the end of the house where an addition to the house was removed. Movant's ex. 2.

7.     Mike Klepp, who is a licensed contractor with experience renovating historic homes in the Flat Rock area, testified at the preliminary hearing and gave an estimate for repairing the property. He testified there was water intrusion in the sunroom and kitchen area, which has caused white mold and deterioration of the floor joists and support beams. His estimate is based on using what he described as medium-grade materials to bring the property to an average everyday standard. He believed the repairs would take at least a year to complete, and it would take two to three months to stabilize the property to stop the water damage. He suspects the interior paint has lead in it. Klepps' total estimate for the repairs is $861,460.85. Movant's ex. 5. He conceded there are other people who might be able to repair the property for a lower amount.

8.     Russell Brands proffered Warren Roberts, III, as an expert in appraising real estate, including historic properties. Debtor did not object to Roberts being considered an expert in these areas or to his appraisal of the North Carolina property being introduced into evidence through his testimony. Movant's ex. 3. Roberts places the value of the raw land portion of the North Carolina property at $474,200 and the value of the improvements to the land, if repaired, at $972,826, meaning the total value of the property, if repaired, is $1,447,026. *Id*. at p. 37. To calculate the value of the property in its current condition, Roberts deducts the cost of repairing the improvements, which in the appraisal is $495,281, resulting in an as is value for the improvements of $477,545. *Id*. Roberts rounds the $477,545 figure up to $478,000 and adds the value of the raw land, which he rounds down to $474,000, to reach an appraisal of $952,000 for

the property in its current condition.  *Id*.  The $495,281 figure Roberts used as the cost for

repairing the property was based on an estimate provided by David Carpenter.  *Id*.  Using

Klepps' estimate, the value of the property in its current condition according to Roberts' formula

is $585,565.15.  Another property in the area sold after the completion of Roberts' appraisal of

the North Carolina property for a price that suggests a lower value for the raw land.

   9.  Debtor has reviewed Roberts' appraisal and agrees with the $1,447,026 value for

the North Carolina property if it is repaired.  However, Debtor believes the property could be

brought to a reasonable standard with between $300,000 and $350,000 in repairs.  Debtor has

restored two other historic houses in different geographic areas than the North Carolina property.

Consequently, assuming it would cost $350,000 to restore the property, Debtor testified his

opinion of the as is value is approximately $1,100,000.[2]

   10.  Russell Brands has filed a proof of claim for $1,125,000.

   11.  Debtor's wealth primarily consists of real estate.  He has 38 acres in Charleston,

South Carolina set for auction along with a motion to sell free and clear of liens set for hearing in

February 2014.  The current stalking horse bid for the Charleston property is $11,500,000.  The

contract with the stalking horse bidder has numerous conditions, including rezoning the property

and obtaining permits for the use to which the bidder intends to put the property.  The stalking

horse bidder can, until the end of 2014, walk away from the contract if the conditions are not

met.  Debtor testified that he thought the proceeds of any sale, including the sale of the

Charleston property, would go to him so he can maintain and repair any property he needs to

sell.

---

[2] In his certification of facts attached to his objection to Russell Brands' motion, Debtor
places the fair market value of the North Carolina property at $1,150,000 and the liens on the
property at $1,125,000.

12.     The debt Debtor owes to Russell Brands is secured by two other properties in the Columbia, South Carolina area, one which Debtor values at $3,600,000 in his schedules and the other which he values at $326,000,000 in his schedules.  The $3.6 million property may be owned by an entity other than Debtor, and Debtor's schedules indicate there may be some "environmental questions" related to this property.  As for the $326 million property, this value is based on the property being used as quarry, a use for which it is not currently zoned.  In 2005 when Debtor was going through a divorce, Debtor valued the $326 million property at $400,000 based on its use at that time.  Part of the $326 million property is in a flood zone.

13.     The North Carolina property is not insured at this time and has not been insured since 2012.

14.     At the preliminary hearing, Debtor testified he has never listed the North Carolina property for sale and does not intend to sell it.  Debtor wants to repair the property and retain it. The house is not Debtor's primary residence.  When question by his attorney at the final hearing, Debtor testified, if necessary, he would sell all of his properties, including the North Carolina property, to pay his creditors.  On cross-examination by Russell Brands' attorney, Debtor testified he plans to sell the property if it is restored.

15.     The North Carolina property is not generating any income for the estate.

16.     Debtor consented to lift the stay with respect to a different piece of property he owns that is in good condition and generating income so that the lien holder can proceed with its state court remedies.  The consent order lifting the stay provides that if a foreclosure decree is obtained in state court, the creditor has to serve the decree on Debtor's counsel who shall then have three days to file an emergency motion requesting this Court stay the foreclosure sale. Docket # 68.

17.   Debtor does not have any money to repair the North Carolina property at this time.

18.   Debtor testified at the final hearing that someone would be at the North Carolina property painting the exterior and repairing the roof within two weeks.

## CONCLUSIONS OF LAW

### A. 11 U.S.C. § 362(d)(1)

Russell Brands seeks relief from the automatic stay with respect to the North Carolina property under 11 U.S.C. §§ 362(d)(1) and (d)(2).  Section 362(d)(1) provides that the Court "shall grant relief from the stay . . . , such as by terminating, annulling, modifying, or conditioning such stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest."   This Court has "broad discretion in determining what constitutes sufficient cause to grant relief from stay."  *In re Gyro-Trac (USA), Inc.*, 441 B.R. 470, 489 (Bankr. D.S.C. 2010).  "Because the Code provides no definition of what constitutes 'cause,' courts must determine when discretionary relief is appropriate on a case-by-case basis." *Robbins v. Robbins* (*In re Robbins*), 964 F.2d 342, 345 (4th Cir. 1992).  This determination involves "balancing potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied."  *Id*.

After careful consideration of the applicable law and evidence presented, the Court grants Russell Brands' request for relief from stay with respect to the North Carolina property by conditioning the further application of the stay.  Much of the testimony focused on whether there was equity in the property and whether it is necessary for reorganization.  These issues have a unique interplay with the finding of cause in the circumstances of this case.  Debtor has no equity

in the property.  Debtor did not disagree with the methodology of determining the as is value of

the property by subtracting the cost of repairs from $1,447,026, as his own figure of $1,100,000

came from subtracting $350,000 from $1,447,026.   Russell Brands has filed a claim for

$1,125,000, and Debtor listed the liens on the property at $1,125,000 in his certification of facts

attached to his objection.   Therefore, Debtor has no equity in the property even using his

$1,100,000 figure.  Moreover, if Klepps' estimate of $861,460.85 for repairing the property is

correct, Russell Brands' lien is nearly twice what the property is currently worth.  In addition to

the lack of equity, Debtor has not had insurance on the property for the duration of this case.  As

for whether the property is necessary for an effective reorganization, Debtor's testimony on this

issue was equivocating at best.  At the preliminary hearing, he testified that he intended to repair

the property and retain it, presumably as a second home since he gave no suggestion of plans to

make it his primary residence.   At the final hearing, he testified he would sell all of his

properties, if necessary, in order to pay his creditors but gave no indication regarding whether the

North Carolina property would be one of the first properties he sold or one of the last.   His

proposed plan provides no indication either but rather simply states that "[t]o the extent [the

auction of the property in Charleston] does not generate sufficient net proceeds to pay his

creditor[s] in full[,] [t]he Debtor will begin to list his remaining real property with real estate

brokers and will [sell] all such property until his debts are paid in full."  Considering Debtor was

unable to testify with any degree of certainty as to whether retaining the North Carolina property

would ultimately be necessary to fund his plan, the Court is also unable to find that the property

is necessary to an effective reorganization.  It is not clear whether the property will be sold or

retained and, if sold, whether it will generate funds for creditors other than Russell Brands.  The

Court notes Debtor's concern that his unsecured creditors might be adversely affected by Russell

Brands asserting a significant deficiency claim as a result of the property selling for $500,000 or less through the foreclosure process.  However, because Debtor has not shown that the property is necessary to an effective reorganization, a valid argument could also be made that it is in the best interest of the unsecured creditors to allow the property to be sold because Russell Brands' claim will be reduced by the $500,000 or other amount obtained through the foreclosure process, which means a larger portion of the proceeds Debtor obtains from the other properties he ultimately sells in this bankruptcy can go to unsecured creditors.

Debtor's primary argument in opposition to Russell Brands' motion is that Russell Brands is adequately protected as a result of the other pieces of real property securing its claim. This Court previously has considered the existence of other collateral securing a creditor's claim, aside from the property with respect to which the creditor seeks relief, in determining whether a creditor is adequately protected and whether granting relief from stay is appropriate. *See In re Riverfront Prop., LLC*, 405 B.R. 570, 574 (Bankr. D.S.C. 2009).  However, the term "cause" under section 362(d)(1) includes more than whether a creditor is adequately protected.  Debtor's counsel agrees the North Carolina property is a "wreck," and the evidence before the Court suggests there is continuing water damage because of the damaged roof that Debtor thought had been repaired.  Furthermore, Debtor indicated he does not have funds to make repairs, and the property is uninsured.  The fact that Russell Brands is arguably adequately protected by its other collateral does not mean it has to stand by and watch while it potentially loses this collateral because of the continuing water damage and lack of insurance.  However, because Russell Brands appears to have some equity cushion in its other collateral, the Court will not terminate the automatic stay with respect to the North Carolina property but rather condition its continued

8

applicability on the contingencies set forth below, including repairing the roof, as Debtor

testified this would be done within two weeks of the final hearing on Russell Brands' motion.

**B. 11 U.S.C. § 362(d)(2)**

Having found relief from stay warranted under section 362(d)(1) for cause, it is not

necessary for the Court to decide whether relief is appropriate under section 362(d)(2).

**CONCLUSION**

For the reasons set forth herein, Russell Brands' motion for relief from stay is granted by

conditioning the continuation of the automatic stay with respect to the North Carolina property as

follows:

1.      Because Debtor indicated he is unable to obtain insurance on the property, Russell

Brands may obtain insurance and provide a copy of the policy and a statement of the cost for the

policy to Debtor and Debtor's counsel.  Within twenty-one (21) days of receiving the policy and

the statement of cost, Debtor shall reimburse Russell Brands for the cost;

2.      A qualified individual must be at the property repairing the roof on the historic

house and painting the exterior within seven (7) days of the entry date of this Order.  Debtor also

must continue to take necessary steps to prevent any further deterioration of the property during

the pendency of this bankruptcy.  Within two (2) days of the commencement of the repairs to the

roof and the painting, Debtor's counsel must report said commencement to Russell Brands'

counsel; and

3.      Debtor must remain current on the local property taxes for the property.

If Debtor fails to meet any of these conditions, Russell Brands may file an affidavit of default

indicating such with this Court and serve the affidavit on Debtor and Debtor's counsel.  Debtor

shall then have seven (7) days to object to the affidavit. If an objection is filed, the Court may

hold a hearing. If no objection is filed, the Court will terminate the stay with respect to the

property without further notice or hearing.

    AND IT IS SO ORDERED.

**FILED BY THE COURT**
**01/21/2014**



Entered: 01/22/2014

David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina