# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF SOUTH CAROLINA

In re:                                          )
                                                )    Bankruptcy Case No. 13-00665-dd
William Maxwell Gregg, II,                      )
                                                )    Chapter 11
                  Debtor.                       )
_____)         **ORDER**

This matter is before the Court on the objection of R. William Metzger, Jr., trustee for the chapter 11 bankruptcy estate of William Maxwell Gregg, II ("Trustee"), joined by German American Capital Corporation, acting by and through its Servicer, Situs Holdings, LLC, to the claim of Jupiter Capital, LLC ("Jupiter Capital"). For the reasons set for below, the Court sustains the Trustee's objection with regards to the NBSC fees and consulting fees. The Trustee's objection is overruled as to Jupiter Capital's attorney fees. Jupiter Capital's allowed claim is $9,922,866.28, as of December 4, 2014.

## I. Summary of Facts and Procedural History

On March 29, 2011, William Maxwell Gregg, II ("Debtor") entered into a Loan Agreement with NBSC, a division of Synovus Bank ("NBSC"). Exh. 5a. The original loan amount was $8,200,000.00. The loan is secured by a first-priority lien on property in Charleston and Richland counties, and the assignment of a deposit account to be established with NBSC. Exh. 5b. The loan documents provided NBSC with the right to reimbursement for reasonable attorney fees and costs associated with default and collection.

The Debtor did not make any payments on the loan, and on December 13, 2011, NBSC and the Debtor entered into a forbearance agreement, which they subsequently amended on March 9, 2012. Exh. 8, 9. On July 17, 2012, NBSC sent the Debtor a letter stating that the forbearance agreement was terminated and the entire amount of the loan was due. Exh. 15. The

1

letter states that the total amount due was $8,304,777.64, plus late fees, attorney fees, and costs of collection, with a per diem of $1,138.89.

NBSC sold the loan to Jupiter Capital on September 6, 2012. Exh. 1. NBSC transferred to Jupiter Capital "all rights, titles and interests in and to the Loan and the Loan Documents, including all sums payable pursuant to the Loan or Loan documents and such other rights, titles, interests, privileges, claims, demands and equities in connection therewith." Exh. 1, ¶ 1. The sale document further states that the "total amount owed on the Note as of September 10, 2012 … is … Principal - $8,200,000, Interest - $167,416.53 **Late Charge $1,000." The amounts due and owing on the loan, as well as the late charge, are handwritten into the sale document and initialed by Edgar A. Buck, who is identified on the signature line as a managing member of Jupiter Capital.

After the sale, NBSC sent the Debtor a letter informing him that it sold the loan to Jupiter Capital. In the letter, NBSC states that the total loan amount due as of the date of the sale is "$8,387,777.64 in principal, interest and late charges plus $50,416.00 in legal fees plus any other fees and expenses that may have accrued." Exh. 6. Jupiter Capital provided the Court with copies of the NBSC attorney invoices. Exh. 16. In a letter dated shortly prior to the hearing on this objection, the NBSC attorneys sent the Jupiter Capital attorneys a letter confirming that they had billed NBSC a total amount of $69,396.00, and that bill had been paid in full by NBSC. Exh. 29. No NBSC attorneys or representatives from NSBC testified at the trial.

The Debtor filed for bankruptcy on February 2, 2013. His assets primarily consist of real property, of which the Mount Pleasant (Charleston County) tract under lien to Jupiter Capital is one of the most valuable. During the bankruptcy, the Debtor made multiple unsuccessful attempts to sell his properties and reorganize. On February 11, 2014, the United States Trustee

filed a motion to convert the case to chapter 7. Two weeks later, the Debtor filed a motion to sell the Mount Pleasant property free and clear of liens by permitting Jupiter Capital to credit bid the property. The Court held a hearing on the motion to convert on March 20 that resulted in the appointment R. William Metzger, Jr. as the chapter 11 trustee on April 1, 2014. The Debtor subsequently withdrew the motion to sell.

The Trustee sought out buyers for the Debtor's various properties, and on July 15, 2014, sought permission from this Court to sell the Richland and Mount Pleasant properties free and clear of liens to Emerson Ventures II, Inc. and Johnson-Mount Pleasant Investments, LLC (together, "Buyer"). The sale would pay Jupiter Capital's claim in full.

Jupiter Capital objected to the sale. The Trustee's contract provided a closing date for both tracts, but permitted the Buyer to extend the closing date of the Mount Pleasant tract. Jupiter Capital was concerned that the option to extend the closing date on the Mount Pleasant tract might result in the Buyer closing on the Richland tract, extending the closing date on the Mount Pleasant tract, and ultimately terminating the contract. Without closing on the Mount Pleasant tract, Jupiter Capital questioned the values allocated to the two tracts and speculated that the Mount Pleasant property could be worth less than the allocated price; thus Jupiter Capital would not be paid the full amount of its claim, the Buyer would receive a windfall, and the Mount Pleasant tract would not be sold for enough to pay its claim in full. This concern was exacerbated by an additional contract provision that the closing of the Mount Pleasant sale would be contingent on the property being rezoned – a contingency previous prospective buyers had unsuccessfully attempted to satisfy. The contract was amended in response to Jupiter Capital's objection and the Court entered an order approving the sale on August 25, 2014. The sale is set to close on or before December 30, 2014.

Shortly after the Court approved the sale, Jupiter Capital filed a motion for relief from stay. In its motion, Jupiter Capital asserted that it was not seeking to interfere with the newly-approved sale, rather, Jupiter Capital wanted relief so that in the event the sale fell through it could proceed with a foreclosure sale in January. The Trustee objected to the motion, arguing that stay relief would confuse an already complicated sale. After holding a hearing and considering the evidence and arguments of the parties, the Court agreed with the Trustee and denied Jupiter Capital's motion, noting that "[i]f there is undue delay or a change in circumstances, Jupiter Capital can quickly renew its request for relief."

The Trustee then filed this objection to Jupiter Capital's claim. Jupiter Capital's claim[1] totals $10,064.782.28, with interest accruing on the principal at $1,822.22 per diem. The proof of claim includes the principal amount of $8,200,000, interest, fees and expenses. The Trustee's objection pertains to:[2]

- Attorney and appraisal fees incurred by NBSC prior to the sale of the note totaling $50,416;
- Consulting fees of Buck Management, a firm hired by Jupiter Capital to service the loan; and
- Attorney fees incurred by Jupiter Capital during the bankruptcy in pursuit of its attempt to credit bid, objection to the sale of its collateral, and motion for relief from stay.

The Court held a hearing on the objection December 9, 2014. The parties presented the Court with documentary and testimonial evidence. First, Jupiter Capital provided testimony from Edgar Alton Buck, Jr. Mr. Buck is the one-third owner of Jupiter Capital; he testified that the other owners of Jupiter Capital are his father and a family trust. He stated that he believed the

---

[1] Jupiter Capital filed its original proof of claim on May 30, 2013, and has since amended it twice, on April 28, 2013, and December 4, 2014. Reference to Jupiter Capital's claim refers to the most recently amended proof of claim.

[2] The Trustee's original objection included additional fees, however, by the time the Court held its hearing and the parties submitted their post-trial memoranda, all other objections had been resolved except for those listed here. The parties agree on the amounts in dispute.

4

sale placed Jupiter Capital in the shoes of NBSC and that Jupiter Capital is entitled to the amounts at issue.

Mr. Buck testified regarding the services provided by Buck Management, a firm composed of Mr. Buck and two other employees, a general counsel and a chief financial officer, both of whom are relatives of Mr. Buck. Buck Management is in the business of managing assets and properties owned by other companies, some of which are owned by relatives of Mr. Buck. Most of these businesses, like Jupiter Capital, do not have employees. Jupiter Capital and Buck Management share a common address.

Buck Management and Jupiter Capital entered into a consulting agreement on September 29, 2012. Exh. 20. The agreement provided that Buck Management "would consult with the members of" Jupiter Capital regarding the Debtor's loan and any matters regarding the Debtor. In return for these services, Jupiter Capital agreed to pay Buck Management at least $3,000 per month, regardless of time spent, and up to $5,000 per month. Additionally, Buck Management charged a $2,500 fee per day to attend hearings. Mr. Buck testified that Buck Management did not keep detailed time records of the work it did or who completed the work. He did not provide the Court with any physical work product or examples of specific tasks Buck Management performed.

Jupiter Capital provided the Court with 12 invoices supporting Mr. Buck's testimony regarding the fees. Exh. 30. The earliest invoice is dated May 30, 2014, and is for $44,300 - the total amount owed for Buck Management's services from October 2012 – March 2014. This cut-off date roughly corresponds with Jupiter Capital's first amended proof of claim that included, for the first time, the Buck Management consulting fee as part of the fees owed on the loan. The remaining 11 invoices are monthly from February 2014 through December 2014, each for either

5

$2,500 or $3,500. The services listed are either "Travel and Attend Hearing" or "Consulting Services."

Finally, Mr. Buck testified regarding Jupiter Capital's actions and strategies throughout the course of the bankruptcy proceeding. He stated that Jupiter Capital pursued a credit bid because it was concerned about the Debtor's ability to close a sale on the property. It then withdrew the credit bid because it came to an agreement with the Trustee about selling the property. Once the Trustee submitted the motion to sell, Jupiter Capital objected because the sale contract contained contingencies that had previously permitted potential buyers to back out of earlier contracts. Mr. Buck pointed out that Jupiter Capital's objection to the sale was resolved prior to the Court granting the Trustee's motion to sell by way of the Trustee making many of Jupiter Capital's requested changes to the contract. Mr. Buck also testified that Jupiter Capital's request for relief from stay was part of Jupiter Capital's overall strategy of putting pressure on the Buyer to close the sale. Jupiter Capital was concerned that without this pressure, the Buyer would continue to extend the closing date and eventually back out of the contract.

Jupiter Capital also provided the Court with the expert testimony of Larry Johnson regarding the reasonableness of its attorney fees. Mr. Johnson testified that the role of creditor's counsel is to protect the creditor and the creditor's interest. Here, the property had suffered various challenges and numerous potential sales had fallen through. A chapter 11 trustee had been appointed partially because the Debtor refused to curb his optimism regarding his potential to reorganize. Mr. Johnson opined that the attorney fees were reasonable, and that Jupiter Capital's changing strategies throughout the course of the bankruptcy were a reasonable protection of its interest.

The Trustee then testified. Mr. Metzger testified that in his experience as a trustee, Jupiter Capital's actions were overly aggressive. He stated that he had never seen a creditor object to a sale when the creditor was going to be paid in full. He believes that Jupiter Capital's actions were an attempt to recover the property for its own means. He also asserted that Jupiter Capital's unwillingness to negotiate or cooperate with him was an expensive detriment to the estate.

At the close of the hearing, the Court asked the parties to submit post-trial memoranda and identify the specific documents and provisions the Court should consider in its ruling. The parties agreed that should the sale close prior to the Court's ruling, the Trustee would remit to Jupiter Capital the amounts not in dispute and hold the remainder in trust, thereby ending the accrual of interest. The parties timely submitted their briefs, and the Court considered them in connection with this opinion.

**II.     Discussion**

At issue here is the propriety and amount of certain fees Jupiter Capital requests this Court allow in connection with its proof of claim. Section 506(b) of the Bankruptcy Code allows oversecured creditors such as Jupiter Capital to recover attorney fees, costs, and charges if the fees would be recoverable pursuant to the terms in the loan agreement and are reasonable. 11 U.S.C. § 506(b). The question of whether the fees would be allowed under the agreement is determined by state law. *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 450 – 51 (2007). The question as to whether the fees are reasonable is determined in accordance with federal law. 4 Collier on Bankruptcy ¶ 506.04[3][b] (Alan Resnick & Henry J. Sommer eds., 16th ed.).

Creditors in chapter 11 proceedings may file proofs of claim showing the amounts owed and the nature of the claim. *See* Fed. R. Bankr. P. 3001. The filing of a claim constitutes prima

7

facie evidence as to its amount and validity. Fed. R. Bankr. P. 3001(f). A claim is deemed allowed, and thus payable through the bankruptcy, absent an objection by a party in interest. 11 U.S.C. § 502(a). If a party objects to the claim, it must then introduce evidence to rebut the claim's presumptive validity. *In re Harford Sands Inc.*, 372 F.3d 637, 640 (4th Cir. 2004). The creditor carries the ultimate burden by the preponderance of the evidence of proving both the amount and validity of the claim. *Harford Sands*, 372 F.3d at 641. Here, the parties agreed at the hearing, and the Court so ruled, that the Trustee met its burden rebutting the claim's presumptive validity. What remains for the Court to consider is whether Jupiter Capital has met its burden of proof.

The resolution of this dispute requires the Court to answers three questions: (1) what right to reimbursement for fees and expenses incurred by NBSC did Jupiter Capital acquire when it bought the loan from NBSC; (2) do the loan documents provide for recovery of the Buck Management consulting fees and, if so, are they reasonable; and (3) were the attorney fees charged by Jupiter Capital reasonable under the circumstances of this case. The parties agree that the Court should apply South Carolina law to determine Jupiter Capital's underlying rights.

A. *Jupiter Capital's Rights Under the Loan Sale Agreement*

The Trustee argues that Jupiter Capital is not entitled to the attorney and appraisal fees incurred by NBSC prior to the sale because the fees were not part of the loan sale and were not incurred directly by Jupiter Capital. Jupiter Capital responds that it is entitled to the fees because, as a transferee of a negotiable instrument, Jupiter Capital is entitled to all fees owed to NBSC at the time of the sale. For the reasons set forth below, the Court disallows these fees.

Ordinarily the transfer of a negotiable instrument passes to the assignee all rights under the instrument. The Court agrees with the Trustee that the loan sale documents did not transfer to

Jupiter Capital NBSC's right to recover pre-sale fees, and looks to South Carolina contract law in arriving at this conclusion. When construing a contract, a court must look first to the language of the contract to determine the intentions of the parties. *F.D.I.C. v. Prince George Corp.*, 58 F.3d 1041, 1046 (4th Cir. 1995) (applying South Carolina law). When that language is plain and unambiguous, a court cannot modify it. *Lewis v. Omni Indem. Co.*, 970 F.Supp.2d 437, 451 (D.S.C. 2013). If the language contains both specific and general terms, then the court must interpret the general language to include "only persons or things of the same general kind or class as those enumerated" rather than broaden the specific term. *Ellis v. Taylor*, 449 S.E.2d 487, 489 (S.C. 1994) (holding that in an agreement where the father agreed to pay reasonable expenses "to the extent that such expenses are not provided by any scholarship, grant or other assistance," for his son's education, those expenses did not include loan repayment because it was not one of the forms of enumerated assistance). If a contract contains both printed language and handwritten additions, the provisions must be harmonized; if they cannot be harmonized, then the handwritten provision prevails. *Hawkins v. Greenwood Dev. Corp.*, 493 S.E.2d 875, 879 (S.C. Ct. App. 1997).

    Here, the loan sale agreement contained broad language transferring to Jupiter Capital all the rights of NBSC under the loan documents. However, it also contained specific, handwritten amounts being transferred. The Court therefore cannot read the broad language to supersede the specific. NBSC sold the right to collect on the note's principal, interest, and late fee, along with a future right to collect fees and costs. It sold nothing further.

    The fact that the numbers were handwritten on the face of the contract supports this conclusion. Handwriting added to a typed contract prevails over the printed words. Handwritten into the loan sale agreement are specific amounts of the principal and interest, as well as the

9

addition of "**Late Fee - $1,000." Mr. Buck initialed these amounts, initialed each page of the contract, and signed the signature page. Mr. Buck's testimony that he thought at the time of the sale that Jupiter Capital was acquiring NBSC's pre-sale rights contradicts the plain, unambiguous language of the document. The contract does not include the right to recover other unenumerated fees and expenses.

Jupiter Capital argues that the language in the loan sale agreement should not matter because the promissory note is a negotiable instrument that was transferred and vested in it all the rights of the transferor. *See* S.C. Code Ann. § 36-3-203(a), (b). Jupiter Capital cites several cases in support of its contention.

Generally, when a negotiable note is transferred it provides the transferee with the right to enforce the note and includes all rights of the transferor at the time of the transfer.[3] S.C. Code Ann. § 36-3-203(b). However, a party may transfer a note partially, conditionally, or with a reservation of rights. *See, e.g.* Williston on Contracts § 74:73, Richard Lord (4th ed.) (discussing the power to enforce a partially assigned debt). Jupiter Capital and NBSC signed a sales contract. That sales contract identified their respective rights and by specification of certain rights and omission of others did not include NBSC's right to recover the fees. Jupiter Capital has presented no case law, and the Court finds none, that would require the Court to ignore the plain language of the contract in favor of the statutory default. Accordingly, the Trustee's objection with regards to the NBSC attorney and appraisal fees is sustained.

B. *Jupiter Capital's Rights Under the Loan Documents*

The parties agree that Jupiter Capital has the right to recover its own collection costs and expenses in connection with its proof of claim. Thus, the Court must next consider whether the

---

[3] Contrary to the Trustee's assertion, the Court sees no reason why this would not ordinarily include the right to recover pre-transfer collection costs including attorney fees paid by the transferor.

management services performed by Buck Management are collection fees or otherwise allowable, and, if so, whether those fees are reasonable.

Jupiter Capital argues that the loan documents permit it to recover Buck Management's consulting fees. In support of its argument, Jupiter Capital points to language in the mortgage document which permits the recovery of fees incurred by agents acting for a lender:

> Lender shall be entitled to sue for and to recover judgment for the whole amount so due and unpaid together with costs and expenses including the reasonable compensation, expenses and disbursement of Lender's agents and attorneys …

Jupiter Capital's interpretation of this clause to include the Buck Management fees is not reasonable under the circumstances or supported by the clause when considered in toto. Generally, when fees are part of the everyday overhead of a lender, and are not beyond the normal operating costs, they are not recoverable. *See First Bank of Ohio v. Brunswick Apartments of Trumbull County, Ltd. (In re Brunswick Apartments of Trumbell County, Ltd.)*, 215 B.R. 520, 525 (B.A.P. 6th Cir. 1998), *aff'd* 169 F.3d 333 (6th Cir. 1999) (holding that the bankruptcy court properly disallowed fees when "[t]he Bank could not demonstrate actual costs and expenses beyond its normal operating costs attributable to the Debtor's loan."); *In re Woods Auto Gallery, Inc.*, 379 B.R. 875, 886 (Bankr. W.D. Mo. 2007) (disallowing consulting fees when the CEO of the lender was more than capable of doing the work). Serving as a consultant is not co-extensive with collection rights and efforts.

Mr. Buck testified that, as a consultant for Jupiter Capital, he reviewed the bankruptcy documents, negotiated with the Debtor and Trustee, and consulted with Jupiter Capital's attorneys. The Court fails to see how this work would fall outside a lender's normal servicing of a loan. The fact that Jupiter Capital does not have employees, and thus must hire a consultant instead of performing work in-house, should not permit it to obtain a windfall when it collects on

a defaulted loan. This is especially so since Jupiter Capital has outside counsel pursuing collection of the debt. Much of the consulting work, if it were properly documented, would thus be duplicative and unnecessary.

Setting aside the question as to whether Buck Management's consulting fees are recoverable under the loan documents, the Court finds that Jupiter Capital did not meet its burden of proof showing that the fees are reasonable. Courts generally do not permit oversecured creditors to claim professional fees when those fees are not supported by "details as to the basis of the charges, the amount of time expended or the precise services rendered." *Woods Auto Gallery,* 379 B.R. at 886 (Bankr. W.D. Mo. 2007) (disallowing consulting fees when those fees were not supported by anything more than "cryptic and incredibly vague" testimony). A court should also view a vague consultant fee with further skepticism when the consultant is an insider of the creditor. *First Bank of Ohio v. Brunswick Apartments of Trumbull County, Ltd. (In re Brunswick Apartments of Trumbell County, Ltd.)*, 169 F.3d 333, 334 – 35 (6th Cir. 1999).

Here, Mr. Buck is clearly an insider of Jupiter Capital. Neither the consultant agreement nor the invoices contain a description of the work performed. The consultant fee was not included on the proof of claim until late in the case, and the dates on the invoices suggest they may have been created solely to support the proof of claim rather than as part of Buck Management's normal course of business. The invoices contain no specific information as to the work performed, the basis of the charges, or the time expended. They merely contain a generic description and a dollar amount. At the hearing, Mr. Buck was unable to provide the Court with any work product or specific descriptions of the work he and Buck Management performed. Under these facts, the Court cannot find that Jupiter Capital met its burden of proof. Recovery of the Buck Management fees is therefore disallowed.

*C. Jupiter Capital's Attorney Fees*

Although section 506(b) provides for an oversecured creditor to recover attorney fees, it is not a guarantee. Rather, "[i]n determining whether a secured creditor should be reimbursed for its attorneys' fees, the bankruptcy court has the responsibility of preventing overreaching by attorneys …" *In re Kroh Bros. Development Co.*, 105 B.R. 515, 520 (Bankr. W.D. Mo. 1989). If the attorney's services "are not reasonably necessary, or where action is taken because of an attorney's excessive caution or overzealous advocacy," a court has the obligation to disallow the fees. *Kroh*, 105 B.R. at 521 (citations omitted). In determining whether fees are reasonable, a court should consider factors such as (1) whether the time spent was appropriate to the complexity of the task, and (2) whether the fee should be adjusted to reflect the court's observation of the nature of the case and manner of its administration. *Wonder Corp. of America*, 72 B.R. 580, 588 – 89 (Bankr. D. Conn. 1987). The court's underlying consideration should focus on whether the economics of the situation, in light of the creditor's interest, justified the attorney's actions. *Woods Auto Gallery*, 379 B.R. at 885 (Bankr. W.D. Mo. 2007).

Jupiter Capital is the largest secured creditor in this case. Its loan encumbers one of the most valuable assets of the Debtor and now totals nearly $10 million. This bankruptcy case has been complicated and collection on this loan has been stayed for almost two years. Jupiter Capital has been understandably anxious about recovering on its debt and protecting its interest, especially given the unique nature of much of the real property. While the Court understands the Trustee's frustration, creditors are not under an obligation to cooperate or compromise to the satisfaction of trustees. The Court does not view Jupiter Capital's legal strategy here as so inconsistent and bellicose as to warrant a finding of bad faith or unreasonableness necessitating disallowing Jupiter Capital's attorney fees.

### III.    Conclusion

For the reasons set forth above, the Trustee's objection to Jupiter Capital's claim is sustained with regards to the NBSC fees and Buck Management fees. The objection is overruled with regards to Jupiter Capital's attorney fees. Jupiter Capital's claim is allowed as follows:

- Principal of $8,200,000.00;
- Interest until the time of payment, totaling $1,637,038.28 as of December 4, 2014;
- Late fee of $1,000;
- Appraisal cost of $3,000; and
- Jupiter Capital's legal fees of $81,828 as of October 31, 2014.

IT IS SO ORDERED.

**FILED BY THE COURT**
**12/19/2014**



David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

Entered: 12/19/2014